# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ralph W. McClain, Jr., | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 44 M.D. 2023 |
| | : | |
| Laurel Harry, Superintendent of SCI-Camp Hill; George Miller, Superintendent of SCI-Waymart; Jaime Sorber, Superintendent of SCI-Phoenix; Pennsylvania Department of Corrections, | : | Submitted: June 16, 2026 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Respondents | : | |

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
PER CURIAM                                    FILED: July 24, 2026

Before this Court are the preliminary objections filed by Laurel Harry, Superintendent of the State Correctional Institution (SCI) at Camp Hill (SCI-Camp Hill) (Superintendent Harry); George Miller, Superintendent of SCI-Waymart (Superintendent Miller); Jaime Sorber, Superintendent of SCI-Phoenix (Superintendent Sorber); and the Pennsylvania Department of Corrections (DOC) (collectively, Respondents) in response to the six-count *pro se* petition for review (PFR) filed by Ralph W. McClain, Jr. (McClain). Therein, McClain seeks declaratory and monetary relief with respect to (1) the alleged denial of programs and services while he was confined in a Psychiatric Observation Cell and Mental Health Unit, (2) the alleged failure to protect him from retaliation by a guard who sprayed him with Oleoresin-Capsicum (pepper) spray when he refused to uncover his cell door window and in-cell camera, (3) the alleged denial of due process before he was involuntarily committed to the Mental Health Unit, and (4) retaliatory treatment, which he claims

infringed on his constitutional rights arising under the First,[1] Eighth,[2] and Fourteenth[3] Amendments to the United States (U.S.) Constitution and Title II of the Americans with Disabilities Act of 1990 (ADA).[4]  For the reasons that follow, we sustain Respondents' preliminary objections and dismiss the PFR.

## I.    Petition for Review

### A. *Factual Allegations*

McClain's PFR alleges the following facts.  McClain is an inmate currently incarcerated at SCI-Phoenix.  During the time of the events pertinent to this matter, McClain had also been incarcerated at SCI-Camp Hill and SCI-Waymart.  McClain describes himself as seriously mentally ill, with diagnoses of schizophrenia, bipolar disorder, major depressive disorder, schizoaffective disorder, post-traumatic stress disorder, anti-social personality disorder, and intermittent explosive disorder.

From October 4, 2021, until October 26, 2021, while at SCI-Camp Hill, McClain was placed in a Psychiatric Observation Cell for a suicide watch after reporting to staff that he had suicidal thoughts "from flash-backs he had been having

---

[1] U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the [g]overnment for a redress of grievances.").

[2] U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[3] U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

[4] 42 U.S.C. §§ 12101-12213.

from his traumatic experience of near suicide by hanging . . . ."[5] (PFR, ¶ 17.) While confined in the Psychiatric Observation Cell, McClain lacked access to a telephone, television, recreational yard, law library, and email. *Id.*, ¶ 20. McClain complains that he should have been released from the Psychiatric Observation Cell to a Special Observation Unit, on October 12, 2021, at the suggestion of Dr. Saiqa Mustaq, a prison psychiatrist. *Id.*, ¶ 22. McClain asserts that if he had been transferred to a Special Observation Unit, he would have been able to have his property, watch television, listen to the radio, go to the yard and use the phone and email kiosk. *Id.* However, the Treatment Manager at SCI-Camp Hill did not approve of the transfer because Lori Newsome and Stacey Imler worked in the Special Observation Unit area and they were named defendants in a lawsuit he filed in 2019, *McClain v. Pennsylvania Department of Corrections*, No. 1:19-cv-1951 (M.D. Pa.), one of McClain's numerous federal lawsuits filed against DOC, prison officials and personnel.[6] *Id.*

---

[5] McClain had previously attempted to commit suicide in 2018 by hanging himself in his cell. (PFR, ¶¶ 17-18.)

[6] Since his incarceration, McClain has filed no less than 22 federal lawsuits against DOC, prison officials and personnel. *See*, *e.g.*, *McClain v. Carney*, No. 2:23-cv-4012 (E.D. Pa.); *McClain v. Hoover*, No. 1:21-cv-992 (M.D. Pa.); *McClain v. Storm*, No. 13-677 (E.D. Va.) (order dated July 8, 2013, dismissing case as frivolous); *McClain v. Kale*, No. 1:10-cv-35 (M.D. Pa.) (judgment for defendants entered 12/12/13); *McClain v. Corbett*, No. 1:10-cv-1517 (M.D. Pa.) (dismissed 03/15/11); *McClain v. Cash*, No. 1:10-cv-2529 (M.D. Pa.) (dismissed 03/23/11); *McClain v. Walsh*, No. 1:12-cv-265 (M.D. Pa.) (dismissed 11/05/12); *McClain v. Davis*, No. 1:12-cv-352 (M.D. Pa.) (judgment for Defendants entered 11/13/12); *McClain v. Legget*, No. 1:13-cv-2057 (M.D. Pa.), transferred, 2:13-cv-1248 (W.D. Pa.) (dismissed 09/26/14); *McClain v. Mosier*, No. 1:13-cv-3011 (M.D. Pa.) (dismissed 09/17/14); *McClain v. Kormanic*, No. 2:09-cv-691(W.D. Pa.) (dismissed 08/20/09); *McClain v. Prebish*, No. 3:10-cv-132 (W.D. Pa.) (dismissed 10/15/10); *McClain v. Scire*, No. 2:10-cv-32 (W.D. Pa.) (dismissed 03/02/10); *McClain v. Kupachella*, No. 3:11-cv-230 (W.D. Pa.) (dismissed 12/30/11); *McClain v. Servello*, No. 2:10-cv-838 (W.D. Pa.) (dismissed 10/15/10); *McClain v. Clark*, No. 2:22-cv-958 (W.D. Pa.) (dismissed 01/23/12), *aff'd*, (3d Cir. 06/07/12); *McClain v. Kushner*, No. 2:11-cv-177 (W.D. Pa.) (dismissed 01/23/12), *aff'd*, (3d Cir. 06/07/12); *McClain v. Flemming*, No. 2:11-cv-1068 (W.D. Pa.) (dismissed 01/23/12), *aff'd*, (3d Cir. 06/07/12); **(Footnote continued on next page…)**

On October 26, 2021, McClain was involuntarily committed under Section 304 of the Pennsylvania Mental Health Procedures Act (MHPA),[7] 50 P.S. § 7304, and transferred to the Mental Health Unit at SCI-Waymart, where he remained for 49 days until December 14, 2021. *Id.*, ¶¶ 19, 30, 36, 49. McClain complains that his involuntary commitment to the Mental Health Unit was unjustified because he only said he was having suicidal thoughts but did not take any action towards actually harming himself. *Id.* He also alleges that DOC and Superintendent Harry conspired with Cumberland County officials to involuntarily commit him without affording him his due process rights because: (1) he did not receive a copy of the commitment petition at least three days prior to the commitment hearing or notice advising him that an attorney was appointed for him or notice that he had the right to be assisted in the

---

*McClain v. Coleman*, No. 2:11-cv-1091 (W.D. Pa.) (dismissed 12/30/11); *McClain v. Lockett*, No. 2:11-cv-1289 (W.D. Pa.) (dismissed 12/30/11); *McClain v. Lesure*, No. 2:11-cv-1430 (W.D. Pa.) (dismissed 12/30/11).

While incarcerated, McClain has also prodigiously utilized the Right-to-Know Law, 65 P.S. §§ 67.101-67.3104, to seek, *inter alia*, private information about prison staff members and Probation and Parole Board (PPB) members by requesting their personal information. *See, e.g.*, *McClain v. City of Philadelphia Law Department*, OOR Dkt. AP 2026-0239 and AP 2026-0240 (seeking employment applications, phone numbers and home addresses for Philadelphia Assistant Solicitor, and staff persons of the Philadelphia Department of Prisons); *McClain v. Pennsylvania Department of Corrections*, OOR Dkt. AP 2021-0285 (seeking home address for former prison superintendent and employees); *McClain v. Pennsylvania Department of Corrections*, OOR Dkt. AP 2021-0254 (seeking last names of prison nurses and copies of their notices of separation); *McClain v. Pennsylvania Department of Corrections*, OOR Dkt. AP 2020-0161 (seeking home addresses for SCI-Graterford employees); *McClain v. Pennsylvania Office of Administration*, OOR Dkt. AP 2020-0121 (seeking civil service job applications for DOC employees); *McClain v. Governor's Office of Administration*, OOR Dkt. AP 2019-0857 (seeking the employment application for prison employee he sexually harassed); *McClain v. Pennsylvania Board of Probation and Parole*, OOR Dkt. AP 2017-0155 (seeking address, e-mails, phone numbers, full names, and dates of hire for PPB officials).

[7] Act of July 9, 1976, P.L. 817, *as amended*. By authority granted in Section 304(a) of the MHPA, a court may order involuntary treatment, not to exceed 90 days, of a person who is "severely mentally disabled and in need of treatment." 50 P.S. § 7304(a).

proceedings by an expert in the field of mental health – all of which are required under Section 304(c)(4) of the MHPA, 50 P.S. § 7304(c)(4);[8] and (2) he was not permitted to attend the involuntary commitment hearing under Section 304(e)(3) of the MHPA, 50 P.S. § 7304(e)(3).[9] *Id.*, ¶¶ 24, 27-29. He further alleges that during the 49 days he was housed at the Mental Health Unit, he was (1) not allowed to use the telephone on the first day, (2) he was only allowed to use the telephone once during his first 30 days, (3) he was required to wear a suicide precaution smock for 11 days, (4) he was without a mattress for 19 days, (5) "Lieutenant O'Brien" sprayed him with Oleoresin-Capsicum spray "in retaliation for" his submission of grievances and complaints;[10] and (6) he was

---

[8] Section 304(c)(4) of the MHPA provides, in pertinent part

> (4) **The court, by summons, shall direct the person to appear for a hearing.** The court may issue a warrant directing a person authorized by the county administrator or a peace officer to bring such person before the court at the time of the hearing if there are reasonable grounds to believe that the person will not appear voluntarily. **A copy of the petition shall be served on such person at least three days before the hearing together with a notice advising him that an attorney has been appointed who shall represent him unless he obtains an attorney himself, that he has a right to be assisted in the proceedings by an expert in the field of mental health**, and that he may request or be made subject to psychiatric examination under subsection (c)(5).

50 P.S. § 7304(c)(4) (emphasis added).

[9] Section 304(e)(3) of the MHPA provides that "[t]he person shall have the right to confront and cross-examine all witnesses and to present evidence in his own behalf." 50 P.S. § 7304(e).

[10] McClain also alleges that he was told Lieutenant O'Brien used the Oleoresin-Capsicum spray because McClain's cell door window and in-cell camera were covered. (PFR, ¶ 42.) McClain does not deny he covered the windows and camera but alleges that no one told him to uncover the window and in-cell camera. *Id.*

denied prison services and programs including access to the yard, dayroom, law library, email kiosk, and commissary. *Id.*, ¶¶ 31-48.

On December 14, 2021, McClain returned to SCI-Camp Hill from SCI-Waymart, where he was placed in segregated housing by prison officials who informed him that he posed a danger to Lori Newsome and Stacey Imler. *Id.*, ¶¶ 52-53. According to McClain, he was placed in segregated housing in retaliation for amending his 2019 federal lawsuit in November 2021 to add eight more defendants. *Id.*, ¶¶ 18, 50, 52.

On January 28, 2022, McClain was temporarily transferred to SCI-Phoenix to attend court, and while there he was housed in solitary confinement. *Id.*, ¶ 58. McClain asserts that his placement in solitary confinement violated DOC Policy DC-ADM 802, which he claims specifically directs that inmates on Authorized Temporary Transfer are not to be placed in Administrative Custody. *Id.*, ¶ 59.

B. *Legal Claims*

In his PFR,[11] McClain asserts six counts based on the above acts and omissions. In Count 1, against DOC, McClain seeks a declaratory judgment under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541, that DOC violated his rights under the **ADA** when it restricted his access to the telephone, television, recreational yard, and law library while he was confined in a Psychiatric Observation Cell for 22 consecutive days. *Id.*, ¶ 61.

---

[11] McClain initially filed his PFR on January 27, 2023. On August 31, 2023, McClain advised the Court that he had not received his mail since July 13, 2023. On September 22, 2023, this Court stayed the proceedings until it received notification from McClain that his mail delivery had resumed. On October 6, 2025, the Court received a letter from McClain, reflecting that he is no longer restricted from receiving legal mail. On October 9, 2025, the stay entered on September 22, 2023, was vacated.

In Count 2, against Superintendent Harry and DOC, McClain seeks a declaration that these Respondents denied him procedural due process under the **Fourteenth Amendment** because he did not receive the involuntary commitment petition three days before the hearing or the notices required by Section 304(c)(4) of the MHPA, 50 P.S. § 7304(c)(4), and was not permitted to attend the hearing in violation of Section 304(e)(3) of the MHPA, 50 P.S. § 7304(e)(3). *Id.*, ¶ 63.

In Count 3, against DOC and Superintendent Miller, McClain seeks a declaration that these Respondents violated his rights under the **ADA** and **Fourteenth Amendment** of the U.S. Constitution by knowingly denying him access to the law library, telephone access, e-mail kiosks, dayroom access, recreational yard and commissary while committed to the Mental Health Unit at SCI-Waymart. *Id.*, ¶ 65.

In Count 4, against Superintendent Miller, McClain seeks a declaration that Superintendent Miller violated his rights under the **Eighth and Fourteenth Amendments** because Superintendent Miller knew of Lieutenant O'Brien's retaliatory motives yet failed to protect him from being sprayed with Oleoresin-Capsicum spray. *Id.*, ¶ 67.

In Count 5, against Superintendent Harry, McClain seeks a declaration that Superintendent Harry violated his rights under the **First Amendment** by causing him to be placed in segregated housing in retaliation for his 2019 federal lawsuit against DOC and officials of SCI-Camp Hill in *McClain v. Pennsylvania Department of Corrections*, No. 1:19-CV-1951 (M.D. Pa.). *Id.*, ¶ 69.

In Count 6, against Superintendent Sorber, McClain seeks a declaration that Superintendent Sorber violated his rights under the **Fourteenth Amendment** by causing him to be placed in segregated housing when he was temporarily at SCI-Phoenix. *Id.*, ¶ 71.

As relief, McClain seeks a declaration that Respondents violated his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution and the ADA, and an award of compensatory and punitive damages in excess of $350,000, plus costs.

Respondents have filed Preliminary Objections in the nature of demurrers to all six counts of the PFR pursuant to Pennsylvania Rule of Civil Procedure 1028(a)(4),[12] arguing that McClain has failed to state any claims upon which relief may be granted.

## II.     Standard of Review – Preliminary Objections

A preliminary objection in the nature of a demurrer tests "the legal sufficiency" of the petition and will be sustained only in cases where the pleader has "clearly failed to state a claim for which relief can be granted." *Clark v. Beard*, 918 A.2d 155, 158-59 n.4 (Pa. Cmwlth. 2007). "The demurrer may be granted only in cases which are so free from doubt that a trial would certainly be a fruitless exercise." *Id.*

In ruling on preliminary objections, this Court accepts as true all well-pled allegations of material fact, as well as all inferences reasonably deducible from those facts. *Key v. Pennsylvania Department of Corrections*, 185 A.3d 421 (Pa. Cmwlth. 2018). However, this Court need not accept unwarranted inferences, conclusions of law, argumentative allegations, or expressions of opinion. *Id.*

## III.     Respondents' Preliminary Objections

### A.  *Count 1: Violation of ADA – Denial of Programs and Services While in Psychiatric Observation Cell*

In their first Preliminary Objection, Respondents contend that McClain has failed to state a valid ADA claim against DOC because he has not articulated facts

---

[12] Pennsylvania Rule of Civil Procedure 1028(a)(4) provides that preliminary objections may be filed by any party for legal insufficiency of a pleading (demurrer). Pa.R.Civ.P. 1028(a)(4).

8

showing that he was denied public services or programs as the result of a disability. The Court agrees with Respondents that McClain has failed to establish the elements of an ADA claim.

Title II of the ADA (relating to public services) provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This Court has explained:

> To establish a violation of Title II of the ADA, a petitioner must show that: (1) he "is a qualified individual with a disability;" (2) he "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against;" and (3) "such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Pesce* [*v. Coppinger*], 355 F. Supp. 3d [35,] 45 [(D. Mass. 2018)] (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)).

*Rokita v. Pennsylvania Department of Corrections*, 273 A.3d 1260, 1272 (Pa. Cmwlth. 2022). Section 12131(1)(B) of the ADA defines public entity as "any department, agency, . . . or other instrumentality of a [s]tate. . . ." 42 U.S.C. § 12131(1)(B). "[S]tate prisons fall within the definition of a 'public entity,' and [ ] inmates may bring ADA claims against state prisons." *Rokita*, 273 A.3d at 1272. Mental illness is a disability under the ADA. 42 U.S.C. § 12102(1)(A). *See also Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting the phrase "services, programs, or activities" in Title II of the ADA includes recreational, medical, educational, and vocational prison programs). The purpose of the ADA is to "eliminate

9

discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).[13]

McClain alleges that when he was confined in a Psychiatric Observation Cell between October 4, 2021, and October 26, 2021, he was not permitted to watch television, access the recreational yard, access the law library, or use the telephone or email kiosk. He contends that the denial of these "programs and services" violated his rights under the ADA. To the extent McClain's claims arise as alleged out of being placed in a Psychiatric Observation Cell, his claims cannot be sustained.

DC-ADM 802 is a policy established by DOC to place in administrative custody status an inmate whose presence in the general population would constitute a threat to life, liberty, himself, staff, other inmates, the public, or the secure or orderly operation of the facility. DC-ADM 802, Policy Statement § III, *available at* https://www.pa.gov/agencies/cor/about-us/doc-policies (last visited July 20, 2026).[14] Administrative custody is a status of confinement for non-disciplinary reasons that provides closer supervision, control and protection than is provided in the general prison population. *Id.* § 3.A.1. An inmate confined in this status may be placed in a Psychiatric Observation Cell by order of the Shift Commander, a psychiatrist, or a Certified Registered Nurse Practitioner for various reasons, including that he is a danger to himself. *Id.* § 1.B.1.

By McClain's own account, he was not placed in the Psychiatric Observation Cell and denied these programs and services due to his disability, *i.e.*,

---

[13] Though we are not bound by federal circuit or district courts' interpretations of federal constitutional law, such interpretations nonetheless operate as persuasive authority, which we may use at our discretion. *See Commonwealth v. Hicks*, 208 A.3d 916, 936 n.13 (Pa. 2019).

[14] We may take judicial notice of DOC's policies which appear on its website. *Hill v. Pennsylvania Department of Corrections*, 64 A.3d 1159, 1165 n.3 (Pa. Cmwlth. 2013).

10

serious mental illness. *Rokita*, 273 A.3d at 1272. Rather, he was placed in a Psychiatric Observation Cell so that he could be continuously monitored because he previously attempted suicide in 2018 and was once again expressing suicidal thoughts. (PFR, ¶ 17.)

DOC Policy 13.8.1, Subsection 2.L.2(c) requires that a suicidal individual "shall be under continuous observation." DOC Policy 13.8.1, Subsection 2.L.2(e) authorizes staff to move a suicidal individual to a Psychiatric Observation Cell for this purpose.

Because McClain was being continuously monitored, he was confined separately and denied access to activities available to the general population, including going to the recreational yard, using a prison telephone, communal television areas, the law library and email kiosk. There is nothing in the PFR which even remotely suggests that he was placed in the Psychiatric Observation Cell due to his disability (serious mental illness) or denied access to these programs and services because of DOC's animus against his disability. Rather, due to level of observation he was under as a result of his suicidal ideations, it was imperative, for his own safety, that he was observed by staff on a continuous and uninterrupted basis. *See* DOC Policy 13.8.1, Subsection 2.L.3.0(1). *See also* DOC Policy 13.8.1, Subsection 3.A.1 (an inmate confined in this status does not have the same privileges as are available within the general population). Allowing McClain to leave the Psychiatric Observation Cell in order to have access to these benefits at a time when he was supposed to be continuously monitored would be inimical to the need for frequent observation and rapid response. Therefore, even accepting the well-pleaded facts in the PFR as true, McClain has failed to state a valid cause of action against DOC upon which relief may

11

be granted under Title II of the ADA. Accordingly, Respondents' Preliminary Objection to Count 1 of the PFR is sustained.

B. *Count 2: Violation of Fourteenth Amendment Denial of Due Process under the Mental Health Procedures Act*

In Count 2, McClain asserts a violation of his due process rights under the Fourteenth Amendment against Superintendent Harry and DOC associated with his involuntary commitment under Section 304 of the Mental Health Procedures Act, resulting in his transfer to the Mental Health Unit at SCI-Waymart on October 26, 2021. Specifically, he asserts that he was not provided with a copy of the involuntary commitment petition three days prior to the hearing, he did not receive notice of court appointed counsel or notice of his right to assistance from a mental health expert in violation of 50 P.S. § 7304(c)(4), and he was not permitted to attend the involuntary commitment hearing in violation of 50 P.S. § 7304(e)(3).

Respondents demur to this Count on the grounds that (1) this claim should be dismissed against DOC, which is not a "person" capable of being subject to suit under Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983;[15] and (2) McClain has

---

[15] Section 1983 of the Civil Rights Act provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

otherwise failed to state a claim against Superintendent Harry for which relief can be granted.

### 1. DOC as a Party

At the outset we note that McClain did not assert a claim under Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983. To the extent McClain is attempting to set forth a constitutional claim, the correct vehicle to do so is Section 1983. *See Jae v. Good*, 946 A.2d 802, 809 (Pa. Cmwlth. 2008) (holding that Section 1983 is the vehicle for vindicating rights conferred in the United States Constitution or in federal statutes). Nevertheless, we will construe the PFR as asserting a claim under Section 1983 because of our obligation to liberally interpret a *pro se* litigant's pleading so as to do substantial justice. *Richardson v. Pennsylvania Insurance Department*, 54 A.3d 420, 425 (Pa. Cmwlth. 2012).

Respondents argue that this Count must be dismissed because a Section 1983 claim can only be brought against a person, and that DOC is not a person amendable to suit under this statute. It is well settled that DOC is not a person subject to suit under Section 1983. *Watkins v. Pennsylvania Department of Corrections*, 196 A.3d 272, 274-75 (Pa. Cmwlth. 2018) (holding that DOC is not a person subject to suit under § 1983). Therefore, Count 2 of McClain's PFR, insofar as it is brought against DOC, must be dismissed for failure to state a claim because DOC is not a person capable of being sued as part of a Section 1983 claim. Accordingly, McClain's Section 1983 claim against DOC is dismissed.

### 2. Fourteenth Amendment Due Process Claim Against Superintendent Harry

"Involuntary civil commitment of mentally ill persons constitutes deprivation of liberty and may be accomplished only in accordance with due process protections." *In re A.J.N.*, 144 A.3d 130, 137 (Pa. Super. 2016). However, "parties

may waive even constitutional challenges by failing to assert them timely and properly." *In re J.M.Y.*, 218 A.3d 404, 417 (Pa. 2019). Such a waiver precludes the party from asserting a collateral attack. *See Mitchell v. United Elevator Co.*, 434 A.2d 1243, 1247 (Pa. Super. 1981) (explaining that where a litigant fails to raise an issue on direct appeal, the doctrine of waiver precludes a collateral attack, even regarding errors of constitutional dimension) (quotation marks and additional citations omitted).

In *In re J.M.Y.*, the Pennsylvania Supreme Court held that due process and other challenges to involuntary commitment proceedings are subject to the 30-day appeal period established by Pennsylvania's Judicial Code, and challenges brought outside this timeframe are untimely and **deprive the court of jurisdiction** to consider the matter. There, J.M.Y, who was initially committed under Section 302 and subsequently under Section 303 of the MHPA,[16] filed a "Petition to Vacate and Expunge Involuntary Civil Commitment" more than two years after he was involuntarily committed. *In Re J.M.Y.*, 218 A.3d at 409. He alleged "that there was no lawful basis for his commitment, which was effectuated through flawed procedures pursuant to Section 302 and 303 of the [MHPA]." *Id.* More specifically, he claimed that his involuntary commitment under Section 302 of the MHPA was unlawful because it was not supported by adequate medical findings, and that he was denied his procedural due process rights because he was not afforded a hearing before being involuntarily committed. *Id.* He asserted that the maintenance of his commitment records served as bar to his lawful ownership and possession of a firearm under

---

[16] Under Section 302, a mental health officer may issue a certification attesting that a person is in need of emergency treatment and take the person to an approved facility for a period not to exceed 120 hours. 50 P.S. § 7302. A certification for extended involuntary emergency treatment may be filed pursuant to Section 303, 50 P.S. § 7303. The person may petition the court of common pleas for review of the certification pursuant to Section 303(g), which provides for a review by a judge of any certification issued by a mental health officer. 50 P.S. § 7303(g).

14

Pennsylvania and federal law and requested that the common pleas court vacate his commitment and expunge all records of his commitment. *Id.*

The court of common pleas ultimately held that J.M.Y.'s involuntary commitment was valid and that J.M.Y. was not entitled to expungement of his treatment records. *Id.* at 410. J.M.Y appealed to the Pennsylvania Superior Court, which reversed. Upon further appeal by the Pennsylvania State Police, the Supreme Court *sua sponte* concluded that neither the common pleas court nor the Superior Court had jurisdiction to review the Section 303 certification because J.M.Y. failed to appeal from the final adjudication within 30 days, pursuant to Section 5571(b) of the Judicial Code, 42 Pa.C.S. § 5571(b). The Supreme Court held that because Section 303(g) furnished the means for J.M.Y. to raise due process challenges to the commitment procedure within 30 days, and because he failed to timely appeal the involuntary commitment until two years later, "neither the common pleas court nor Superior Court had jurisdiction to consider the merits of those claims." *Id.* at 418. The Supreme Court explained that

> the certification of the mental health review officer, as a quasi-judicial officer, constitutes a "final adjudication or determination" of a local agency or a Commonwealth agency. Consequently, inasmuch as a mental health review officer is considered a local agency or Commonwealth agency, the mental health review officer must be classified as a government unit . . . and, under Section 5571(b) of the Judicial Code, "an appeal from a tribunal or other government unit to a court . . . must be commenced within 30 days after the entry of the order from which the appeal is taken," 42 Pa.C.S. § 5571(b). [An individual], therefore, ha[s] 30 days from the date of the mental health review officer's Certification to petition the court of common pleas for review of any due process or other challenges to the [Section 303] Certification. . . . [N]either the court of

15

> common pleas nor the Superior Court ha[s] jurisdiction to consider the merits of [ ] claims [raised in an untimely petition].

*Id.* (some citations omitted). The *J.M.Y.* Court specifically rejected the notion that J.M.Y. could bring his due process challenge to his Section 303 commitment "at any time and in the manner he chose" and that "the time period for filing a petition under this section is essentially boundless." *Id.* at 417-18.

*J.M.Y.* does not address the court-ordered commitment procedures involved in this case under Section 304,[17] but we are not aware of any statute that would permit a challenge to the common pleas court's Section 304 commitment decision at some later date. Accordingly, in the absence of any overriding statutory language, the default appellate provisions of the Judicial Code presumably apply. *See* 42 Pa.C.S. § 5571(b) ("an appeal from . . . a court to an appellate court must be commenced within 30 days after the entry of the order from which the appeal is taken").[18] Here, it is undisputed that McClain made no attempt to appeal or otherwise assert a prompt challenge to the validity of his court-ordered Section 304 involuntary commitment. As in *J.M.Y.*, McClain's failure to timely appeal within 30 days deprives this Court of subject matter jurisdiction to consider his request for direct review of his involuntary commitment and authorizes this Court to dismiss this claim on this ground *sua sponte*.[19]

---

[17] Section 304 proceedings result in court orders for involuntary treatment. 50 P.S. § 7304.

[18] *See e.g.*, *In re Hutchinson*, 454 A.2d 1008 (Pa. 1982) (timely appeal taken to Superior Court from trial court order involuntarily committing individual under Section 304).

[19] When a matter is brought in a court that does not have jurisdiction, the court shall not dismiss the matter but shall transfer it to the proper court of the Commonwealth. Pa.R.A.P. 751(a); 42 Pa.C.S. § 5103(a). However, "[w]hile our usual remedy would be to transfer to an appropriate court, we can refuse to transfer, in the interest of judicial economy, if we determine that there are no circumstances under which relief could be granted." *Richardson v. Pennsylvania Department of Corrections*, 991 A.2d 394, 397 (Pa. Cmwlth. 2010) (citing *Smock v. Commonwealth*, 436 A.2d 615, **(Footnote continued on next page…)**

16

## C. *Count 3: Violation of ADA and Fourteenth Amendment Denial of Programs and Services While in MHU*

In Count 3, McClain asserts a violation of the Fourteenth Amendment and ADA against Superintendent Miller associated with McClain's involuntary confinement in the Mental Health Unit at SCI-Waymart under involuntary commitment. *See* PFR, ¶¶ 31-48, 65. In support of this claim, McClain alleges that after his involuntary commitment and transfer to the Mental Health Unit at SCI-Waymart his access to "programs and services," including the prison phone system, email kiosk, day room, yard and commissary, were improperly restricted. *Id*.

Respondents preliminarily object to this Count on the grounds that McClain fails to state an actionable claim against Superintendent Miller under the ADA because Superintendent Miller is not an "entity" against whom the ADA provides a cause of action.

Title II of the ADA (relating to public services) provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA individuals have no liability because they are not "public entities." *Watson v. Pennsylvania Department of Corrections*, 990 A.2d 164 (Pa. Cmwlth. 2010). *See also Emerson v. Thiel College*, 296 F.3d 184, 188 (3d Cir. 2002) (holding that Title II of the ADA creates a cause of action against public entities but does not contemplate lawsuits against government employees in their individual capacities). Following this prevailing rule, we conclude that there is no individual

---

617-18 (Pa. 1981)). We conclude that this is such a circumstance, and that transfer to the Superior Court would be a futile endeavor from a timeliness standpoint that would disserve the interest of judicial economy.

17

liability under Title II of the ADA and McClain cannot prevail on the merits of his ADA claim against Superintendent Miller.

    D. *Count 4: Violation of Eighth and Fourteenth Amendments (Failure to Protect from Retaliation)*

In Count 4, McClain asserts a failure to protect claim in violation of the Eighth and Fourteenth Amendments against Superintendent Miller, whom he claims was made aware of Lieutenant O'Brien's retaliatory motives against McClain a week prior to when he was sprayed with Oleoresin-Capsicum. (PFR, ¶¶ 31-48, 67.) Respondents argue this claim should be dismissed because McClain has failed to state a claim for which relief may be granted.

A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994). "To state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

A substantial risk of serious harm is one in which the risk is "so great that it is almost certain to materialize if nothing is done." *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004).

> "Vague threats communicating a general risk of violence are not sufficiently substantial under the standard." *Willie v. Pugh*, (E.D. Wis., No. 13-cv-1024-pp, filed August 16, 2016), slip op. at 6. Similarly, a prison official's mere knowledge of vague threats against an inmate is not sufficient to make it clear to the official that such information

presents a substantial risk of serious harm to the prisoner. *Armstrong v. Price*, 190 [F. App'x] 350, 352-53 (5th Cir. 2006) (unpublished); *see Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008) ("The facts of this case make clear our reason for requiring more than general allegations of fear . . . .").

*Horan v. Newingham* (Pa. Cmwlth., No. 2622 C.D. 2015, filed October 24, 2016), slip op. at 15-16.[20] The United States Court of Appeals for the Third Circuit has further held that the knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).

Here, McClain alleges that on November 3, 2021, he informed "Captain Reedy" that Lieutenant O'Brien had "been taking retaliations against [him]" and that he "feared for his physical safety in the [Mental Health Unit] due to threats by officers who work under the supervision of [Lieutenant] O'Brien." (PFR, ¶ 43.) According to the PFR, Captain Reedy informed McClain that he "would email Superintendent Miller about his claims of retaliation." *Id.*, ¶ 44. McClain also alleges that he had filed multiple retaliation grievances against Lieutenant O'Brien several days prior to the day Lieutenant O'Brien sprayed him with Oleoresin-Capsicum. *Id.*

This is the full extent to which McClain specifies the threats themselves and the circumstances surrounding the alleged threats. Without any additional detail and context, these cursory and vague allegations of threats are insufficient to demonstrate that McClain faced a substantial risk of serious harm or that Superintendent Miller was aware of such risk. McClain does not allege that he had

---

[20] Unreported decisions of this Court filed after January 15, 2008, may be cited for their persuasive value. *See* Section 414(a) of the Commonwealth Court Internal Operating Procedures, 210 Pa. Code § 69.414(a).

19

been threatened, nor did he state facts demonstrating a risk so great that it was almost certain to materialize if Superintendent Miller did not protect him. Rather, he has pled vague threats communicating a general risk of violence that are not sufficiently substantial under the substantial risk of serious harm standard. *Horan*, slip op. at 16-17 (*quoting Willie*, slip op. at 6). *See also Klebanowski*, 540 F.3d at 639-40 (concluding that a prisoner failed to prove that the defendants were aware of a particular threat where the prisoner did not provide sufficient detail regarding the threat; "[w]ithout these additional facts to rely on, there was nothing leading the officers to believe that [the prisoner] himself was not speculating regarding the threat he faced[.]")

Moreover, the allegations of the PFR state another possible reason that McClain was sprayed with Oleoresin-Capsicum. Specifically, McClain alleges facts which contradict his contention that he was sprayed with Oleoresin-Capsicum in retaliation for his grievances filed against Lieutenant O'Brien. He admits he covered the window of his cell door and the in-cell camera. (PRF, ¶ 42.) DOC Policy 13.8.1, Subsection 2.L.3.0(1) provides:

> If the camera is covered, then the necessary actions must take place in order to remove the objects covering the camera. If this is not possible, then the officer shall be assigned to the cell door and must have full view of the individual at all times. If the individual is continuously covering the view into the cell, all necessary actions need to take place in removing the objects that are being used to cover the view of the individual, this does not require orders from Psychiatry.

Therefore, it is impossible to know based on the PFR whether retaliation was the only possible reason for Lieutenant O'Brien's actions. Consequently, McClaim has failed to state an Eighth Amendment violation claim against Superintendent Miller upon

20

which relief could be granted. Accordingly, Respondents' Fourth Preliminary Objection is sustained.[21]

### E. *Count 5: Violation of First Amendment (Retaliatory Placement in Segregated Housing)*

In Count 5, McClain alleges that Superintendent Harry violated his First Amendment rights by approving his placement in segregated housing on December 19, 2021, when he returned from the Mental Health Unit at SCI-Waymart. He contends that his placement in segregated housing rather than in general population was in retaliation for his "prior and continuing civil action prosecutings [sic]" against Lori Newsome, Stacey Imler and other Camp Hill mental health treatment staff in *McClain v. Pennsylvania Department of Corrections*, No. 1:19-CV-1951 (M.D. Pa.). (PFR, ¶ 52.)

Respondents demur to this Count, arguing that McClain has failed to state a claim for which can be granted.

In order for an inmate to establish a valid First Amendment retaliation claim, he must demonstrate that: (1) the conduct that led to the alleged retaliation was constitutionally protected; (2) the inmate suffered some "adverse action" at the hands of the prison officials; and (3) there is a causal link between the exercise of his

---

[21] As to McClain's Fourteenth Amendment claim based on the same allegations, we find it is duplicative of his Eighth Amendment claim. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations and citation omitted).

Here, McClain is attempting to raise a claim under the Eighth and Fourteenth Amendments based on the same conduct, *i.e.*, failure to protect. Because the Eighth Amendment provides an explicit source of protection, McClain's claims are preempted by the Eighth Amendment and will not be analyzed as due process claims under the Fourteenth Amendment. Accordingly, McClain's Fourteenth Amendment due process claims fail as a matter of law.

21

constitutional rights and the adverse action taken against him. *Wilson v. Marrow*, 917 A.2d 357 (Pa. Cmwlth. 2007); *Luckett v. Blaine*, 850 A.2d 811 (Pa. Cmwlth. 2004); *Yount v. Department of Corrections*, 886 A.2d 1163 (Pa. Cmwlth. 2005). "An inmate may satisfy the requirement of 'adverse action' by demonstrating that the action taken by officials was sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Yount*, 886 A.2d at 1167.

Respondents do not dispute, and we agree, that McClain has set forth facts that, if proven, would satisfy the first two prongs of the retaliation test because (1) he engaged in protected conduct when he filed the federal complaint at *McClain v. Pennsylvania Department of Corrections*, No. 1:19-CV-1951 (M.D. Pa.), and (2) placement in segregated housing is an adverse action that would deter a reasonably firm prisoner from exercising his First Amendment rights. *See Bounds v. Smith*, 430 U.S. 817 (1977) (filing of a complaint by a prisoner has been classified as a constitutionally protected activity when stating a claim for retaliation); *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003) (placement of a prisoner in administrative segregation or disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights).

However, allegations of adverse actions alone are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct. The inmate must also shoulder the substantial burden of demonstrating that the alleged retaliatory actions would not have occurred "but for" the alleged protected activity. *Johnston v. Lehman*, 609 A.2d 880, 884 (Pa. Cmwlth. 1992). Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a

22

causal link. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Here, we cannot simply infer from the allegations of the PFR that Superintendent Harry was acting in a retaliatory manner. For McClain to overcome the "but for" standard, he was required to state more than just general attacks on Superintendent Harry's motives. He has failed to do so. By simply stating that Superintendent Harry placed him in segregated housing on December 14, 2021, as direct retaliation for filing a federal lawsuit against persons other than himself, which had been languishing on the docket since 2019, McClain clearly does not establish that he would not have been placed in segregated housing "but for" that federal lawsuit. *See Evans v. Rozum* (U.S. Dist., W.D. Pa., Civil. Action No. 07-230J, filed December 17, 2009), 2009 WL 5064490, at \*22 ("There is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others."). The allegations in the PFR relating to any causal connection between the protected activity and adverse action are wholly conclusory. Because McClain has failed to allege the requisite existence of a causal relationship, we conclude that McClain has failed to state a valid First Amendment retaliation claim.

F. *Count 6: Violation of Fourteenth Amendment Placement in Segregated Housing*

In Count 6, McClain asserts that, "despite DC-ADM 802 policy specifically stating that inmates on [Authorized Temporary Transfer] for court writ are not to be placed on Administrative Custody – segregation – and housed in Level 5 solitary confinement," Superintendent Sorber ordered him to be housed in solitary confinement the entire time he was on Authorized Temporary Transfer at SCI-Phoenix

23

while he was on for court writ. (PFR, ¶¶ 58-59.) He claims this constituted a violation of his due process rights under the Fourteenth Amendment. *Id.*, ¶ 71.

Respondents argue this Count must be dismissed because McClain has failed to state a claim for which relief could be granted. We agree.

A claim relative to the due process clause requires a two-part analysis including whether the liberty interest asserted is one that is protected by the Fourteenth Amendment. *Shore v. Pennsylvania Department of Corrections*, 168 A.3d 374, 383 (Pa. Cmwlth. 2017). If it is a protected interest, we must then determine what process is necessary to protect it. If the interest is not protected, no process is necessary. *Romig v. Wetzel*, 309 A.3d 1108 (Pa. Cmwlth. 2024); *Lopez v. Pennsylvania Department of Corrections*, 119 A.3d 1081 (Pa. Cmwlth. 2015). Thus, at the threshold, McClain must aver sufficient facts to establish that he had a protected liberty interest that triggered due process rights.

To that end, McClain avers that his placement in segregated housing while on Authorized Temporary Transfer violated DC-ADM 802, which in turn, violated his due process rights. DC-ADM 802.1.B.4 provides:

> **Temporary transfers, including a 5B, shall not be confined in restricted housing solely on the basis of a temporary transfer status. There must be additional supporting rationale that indicates the inmate is a risk, or at a risk, to release to [General Population (GP)].** Facilities shall place all temporary transfers in GP **except when exigent circumstances exist.** The initial reception committee in conjunction with [Program Review Committee (PRC)], shall review DOCInfo for any such indicators to base their decision on placing the inmate in restricted housing or releasing to GP when received. Out of state [Parole Violators (PVs)] shall be placed in GP absent the exigent circumstances as defined within Subsection B.2. above.

24

(emphasis added).

Contrary to McClain's contention, DC-ADM 802.1.B.4 does not create a protected liberty interest in avoiding placement in segregated housing when on Authorized Temporary Transfer. The policy clearly contains exceptions when the inmate is a risk, or at a risk, to release to GP, or where "exigent circumstances exist."

We have repeatedly held that "[i]t is entirely a matter of [DOC's] discretion where to house an inmate." *Clark v. Beard*, 918 A.2d 155, 160 (Pa. Cmwlth. 2007). "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Under DOC's regulations, "an inmate does not have a right to be housed in a particular facility or in a particular area within a facility." 37 Pa. Code § 37.11. "[J]udges may not indiscriminately denominate the place a prisoner is housed; statutes and regulations establish the presumptive place of confinement." *Clark*, 918 A.2d at 161. As this Court stated in *Dial v. Vaughn*, 733 A.2d 1 (Pa. Cmwlth. 1999):

> [C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and denials of privileges— matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison officials.

*Id.* at 6 (citation and quotations omitted).

Moreover, a change in the level of an inmate's security within a prison is not the type of deprivation of a liberty interest that provides a legitimate basis for an inmate lawsuit. *Sandin v. Conner*, 515 U.S. 472, 485 (1995). The U.S. Supreme Court, in *Sandin*, reviewed the scope of an inmate's right to assert a due process challenge to placement in segregated confinement in a correctional facility and concluded that state-created liberty interests could arise only when a prison's action imposed an "atypical

25

and significant hardship on the inmate in relation to the ordinary incidents of prison life" *Id.* at 484. This Court in *Feliciano v. Pennsylvania Department of Corrections*, 250 A.3d 1269 (Pa. Cmwlth. 2021), summarized:

> [T]he proper methodology for evaluating [procedural due process] deprivation claims under *Sandin* is to consider (i) the conditions of confinement relative to administrative segregation, (ii) the duration of that confinement generally, and (iii) the duration relative to length of administrative segregation routinely imposed on prisoners serving similar sentences.

*Id.* at 1279.

Turning to the PFR here, McClain fails to state that his temporary placement in segregated housing while on Authorized Temporary Transfer to SCI-Phoenix constituted an atypical and significant hardship on him in relation to the ordinary incidents of prison life. *Sandin*. McClain does not aver how long he was temporarily housed in Administrative Custody status at SCI-Phoenix, but given his concession that it was temporary and only for his appearance in criminal court it can likely be assumed that the duration was short. He also does not describe the conditions while he was temporarily placed there. Finally, he does not specify in the PFR how being placed in segregated housing is an atypical and significant hardship in relation to the ordinary incidents of prison life, particularly when the law is well settled that the mere placement in segregated housing is not, itself, an atypical or significant deprivation that creates a liberty interest subject to due process protection. *See Sandin*.

Because McClain's placement in segregated housing while on Authorized Temporary Transfer does not implicate due process protections in the first instance, Respondents' Preliminary Objection is sustained.

26

## IV. <u>Conclusion</u>

Accepting as true all well-pleaded material allegations in the PFR, as well as all inferences reasonably deduced therefrom, as this Court must, it is clear and free from doubt that the law will not permit recovery by McClain for violations of the First, Eighth or Fourteenth Amendments, or Title II of the ADA. Because McClain has failed to state a claim for which any substantive relief could be granted under those legal theories, this Court sustains the Preliminary Objections of Respondents and dismisses the PFR with prejudice.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ralph W. McClain, Jr., :
                Petitioner :
                 :
           v. : No. 44 M.D. 2023
                 :
Laurel Harry, Superintendent of SCI- :
Camp Hill; George Miller, :
Superintendent of SCI-Waymart; :
Jaime Sorber, Superintendent of SCI- :
Phoenix; Pennsylvania Department :
of Corrections, :
                Respondents :

## *PER CURIAM*

## *ORDER*

AND NOW, this 24th day of July, 2026, the preliminary objections filed by Laurel Harry, Superintendent of the State Correctional Institution (SCI) at Camp Hill; George Miller, Superintendent of SCI-Waymart; Jaime Sorber, Superintendent of SCI-Phoenix; and the Pennsylvania Department of Corrections are SUSTAINED. The Petition for Review filed by Ralph W. McClain, Jr. is hereby DISMISSED with prejudice.